UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| TALKING RAIN BEVERAGE COMPANY, INC., | ) ) ) |  CASE NO. C15-1804RSM |
| Plaintiff, | ) ) ) |  ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| v. | ) ) ) |  |
| DS SERVICES OF AMERICA, INC., | ) ) ) |  |
| Defendant. | ) |  |

## I.   INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction. Dkt. #4.   Plaintiff alleges trademark infringement, and seeks an injunction precluding Defendant from selling its SPARKLETTS ICE product pending a decision on the merits of this action.   The Court held oral argument on the motion on February 10, 2016.   Having reviewed the parties' briefing, having considered the parties' arguments, and for the reasons discussed herein, the Court now DENIES the motion.

## II.   BACKGROUND

Plaintiff, Talking Rain Beverage Company, Inc. ("Talking Rain"), sells a line of flavored carbonated waters under the federally registered trademarks SPARKLING ICE and ICE.   Defendant, DS Services of America, Inc. ("DS Services"), has recently begun to sell its own line of flavored carbonated waters under the name SPARKLETTS ICE.   As further

ORDER
PAGE - 1

discussed below, Talking Rain asserts that SPARKLETTS ICE infringes on the SPARKLING ICE and ICE trademarks.

### A. Talking Rain Background

Talking Rain is a Washington corporation based in Preston, WA.  Plaintiff asserts that the most significant element of the company's growth in the last 20+ years has been the company's SPARKLING ICE brand of naturally flavored carbonated waters, originally introduced in 1993.  Dkt. #5 at ¶ 3.  Since then, the brand has expanded to include twenty different flavor varieties, including Orange Mango, Black Raspberry, and Pink Grapefruit.  *Id.* and Exs. 12-14.

Plaintiff states that for simplicity, the instant motion focuses primarily on its trade dress portion of its infringement claims.  Plaintiff asserts that in the latter part of the last decade, it adopted the bottle trade dress – the overall "look" of the product – that it has used continuously since then.  Dkt. #5 at ¶ 4.  The principal elements of that trade dress are (i) a tall, slender 17-ounce clear plastic "candlepin" bottle with a petaloid base; (ii) a transparent wrap-around label that extends nearly the entire length of the bottle and leaves the colored contents of the bottle visible; (iii) the brand name of the product and the name of the flavor written in white letters on the label; and (iv) an image of fruit (corresponding to the flavor variant) encased in an ice cube shown above the name SPARKLING ICE.  *Id.*  The product is sold primarily in single-serve bottles.  *Id.*

Plaintiff notes that measured retail sales of SPARKLING ICE have increased more than a hundred-fold in the past five years, from $3.3 million in 2010 to over $390 million in 2014.  *Id.* at ¶ 5.  Today, approximately 100,000 retail outlets in the U.S. sell SPARKLING ICE, including supermarkets, mass retail stores, wholesale clubs, drug stores, and convenience stores

in all fifty states.  *Id.*  SPARKLING ICE is now the nation's number one brand of bottled carbonated water (both by market share and sales volume), ahead of such well-known brands as Perrier and Poland Spring.  *Id.*  A 17-ounce bottle of SPARKLING ICE typically sells at retail for $1.00 to $1.29 before tax.  *Id.* at ¶ 4.  Consumers can also order the product for home delivery through PeaPod and Amazon, and for office delivery through Costco Business.  *Id.* at ¶ 5.  For the 52 weeks ending in late October 2015, Talking Rain sold over 411 million bottles of SPARKLING ICE, representing over $430 million in measured retail sales.  *Id.*  at ¶ 6.  Since 2010, Talking Rain has spent over $75 million to promote the SPARKLING ICE brand.  *Id.* at ¶ 6.

Since 1995, Talking Rain has owned U.S. Registration No. 1,944,414 for the word mark SPARKLING ICE for non-alcoholic soft drinks.  *Id.* at ¶ 8 and Ex. 2.  In 2001, Talking Rain submitted a declaration of continued use required under 15 U.S.C. § 1065 to render that registration "incontestable."  *Id.* at ¶ 8 and Ex. 3.  Talking Rain also owns U.S. Registration No. 2,040,885 for the word mark ICE for carbonated and noncarbonated flavored and unflavored water.  *Id.* at ¶ 8 and Ex. 4.  That registration is likewise incontestable.  *Id.* at ¶ 8 and Ex. 5.  In addition, Talking Rain holds federal registrations for multiple design marks consisting of images of fruit in an ice cube.  Those include No. 3,957,519 for an image of a sliced orange; No. 4,472,525 for an image of a sliced grapefruit; and No. 4,472,527 for an image of a berry.  *Id.* at ¶ 10 and Exs. 6-8.

**B.  Sparkletts Background**

DS Services is a Delaware corporation that has its principal place of business in Georgia and is registered to do business in Washington.  It is a wholly-owned subsidiary of Cott Corporation, a multinational producer of soft drinks, carbonated waters, and energy drinks.  For

over 90 years, the SPARKLETTS brand has been used in conjunction with water products for consumers. Dkt. #26 at ¶ 3. Since at least as early as 1925, SPARKLETTS has acted as a housemark and effective source indicator of premium bottled water products and delivery services. Dkts. #28, Ex. 1 and #26 at ¶ 3. One aspect of DS Services' general business strategy is to grow its brands relative to changes in the market. *Id*. at ¶ 16. In 2014, DS Services became aware that flavored sparkling water was one of the fastest growing segments in the bottled beverage industry. *Id*. at ¶ 17. That year, DS Services decided to introduce new lines of sparkling water under the SPARKLETTS trademark – SPARKLETTS sparkling water and SPARKLETTS "ice" sparkling water. Dkt. #26 at ¶ ¶ 19-22. According to DS Services, it utilized the "ice" descriptor for one line of its sparkling water products "because that term has become synonymous with zero calorie, sparkling water products with a strong fruit flavor that are served cold." Dkt. #25 at 2 (citing Dkt. #26 at ¶ 22).

The SPARKLETTS "ice" product is sold in retail grocery store locations and directly by DS Services. Dkt. #26 at ¶ ¶ 26-32. Direct orders for SPARKLETTS "ice" can be made through salespeople, truck delivery drivers, telephone, or online. *Id*. at ¶ ¶ 26-28. Direct sales are made and delivered to homes and businesses for consumption by individuals at home and business employees. *Id*. at ¶ ¶ 26-32. Direct orders for SPARKLETTS "ice" are delivered via a delivery truck. *Id*. In markets where DS Services uses its SPARKLETTS brand, the delivery truck that delivers SPARKLETTS "ice" is prominently branded with the SPARKLETTS trademark and the delivery person wears a SPARKLETTS uniform. *Id*. While DS Services does sell to some retail locations and through the internet, it primarily sells directly to end users, not retail locations. Dkt. #26 at ¶ 32.

ORDER
PAGE - 4

**C. Alleged Infringement**

Talking Rain states that in early March 2015, it learned through trade sources that DS Services was planning to launch a line of flavored carbonated waters under the name SPARKLETTS ICE.  Dkt. #4 at 4.  Accordingly, on March 10, 2015, Talking Rain sent DS Services a letter informing it of Talking Rain's trademark rights and demanding that DS Services withdraw its plans to use the SPARKLETTS ICE mark.  Dkt. #5 at ¶ 11 and Ex. 9.  On March 24, 2015, DS Services responded, stating its reasons why it believed it was not infringing and stating that it would vigorously defend any infringement claims.  *Id.* at ¶ 11 and Ex. 10.

On May 4, 2015, DS issued a press release announcing that it would be "entering the fast growing sparkling beverage category" with the introduction of "***Sparkletts® ice***, a zero-calorie sparkling beverage with a variety of fruit flavors."  *Id.* at ¶ 12 and Ex. 11 (bold and italics in original).  The release stated that SPARKLETTS ICE would "roll out to retailers as well as home and office delivery customers starting May 2015," and would be available in Pink Grapefruit, Black Raspberry and Orange Mango flavors.  *Id.*  Plaintiff asserts that since early June 2015, Talking Rain personnel have observed SPARKLETTS ICE on sale at an Ultra Foods store in Illinois, an Albertson's store in Idaho, and a Unified Expo store in Southern California.  Dkt. #5 at ¶ ¶ 16-18 and Exs. 15-16.  Retail prices for a 17-ounce bottle of SPARKLETTS ICE have ranged from $0.88 to $1.19.  *Id.* at ¶ 20.

## III.    DISCUSSION

In determining whether to grant a preliminary injunction, this Court considers: (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to that party if an injunction is not issued; (3) the extent to which the balance of hardships

favors the moving party; and (4) whether the public interest will be advanced by the injunction. *See Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980).  The Ninth Circuit has often compressed this analysis into a single continuum where the required showing of merit varies inversely with the showing of irreparable harm.  *See Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000).  Thus, Talking Rain will be entitled to preliminary relief if it is able to show either: (1) probable success on the merits and the possibility of irreparable harm; or (2) the existence of serious questions going to the merits and a fair chance of success thereon, with the balance of hardships tipping sharply in favor of an injunction.  *Miller*, 19 F.3d at 456.

**A.  Likelihood of Success on the Merits**

Plaintiff argues that it is likely to succeed on its claims in Counts I and II of the Complaint for infringement of the federally registered SPARKLING ICE and ICE word marks under Section 32 of the Lanham Act, 15 U.S.C. § 1114.  To prevail on those claims, Talking Rain must show (1) that it has a protected ownership interest in the marks; and (2) that DS Services' use of the mark SPARKLETTS ICE is likely to cause consumer confusion, thereby infringing on Talking Rain's rights.  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).

*1.  Protected Ownership Interest*

As an initial matter, the Court finds that Talking Rain has a protected ownership interest in the marks SPARKLING ICE and ICE.  It is not entirely clear whether DS Services disputes this element.  *See* Dkt. #25 at 9 fn. 5.  However, the Court notes that registration of a mark is *prima facie* evidence of the validity of the mark, the registrant's ownership of the mark, and the

registrant's exclusive right to use the mark in connection with the goods specified in the registration.   *See* 15 U.S.C. § 1115(a).   When proof of registration is uncontested, the ownership interest element of a trademark infringement claim is met.   *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).   Thus, Talking Rain has met the first element of trademark infringement.

### 2. *Consumer Confusion*

The Court next turns to the second element – consumer confusion.   To succeed on this element, Talking Rain must show that a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of DS Service's SPARKLETTS ICE beverage and to associate that beverage with Talking Rain's SPARKLING ICE.   *Pom Wonderful*, 775 F.3d at 1125 (citing *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)). The Court looks to eight factors, known as the *Sleekcraft* factors, for guidance in assessing the likelihood of consumer confusion: (1) strength of the protected mark; (2) relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing mark; (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product expansion.   *Id.* (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), *abrogated on other grounds by Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003)).

The Ninth Circuit Court of Appeals has instructed that although these *Sleekcraft* factors "channel the analytical process," they do not necessarily dictate a result.   *Pom Wonderful*, 775 F.3d at 1125 (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002)). "Because the factors are 'fluid,' a 'plaintiff need not satisfy every factor, provided that strong

showings are made with respect to some of them.'" *Id.* (quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005)).  Thus, it is "the totality of facts in a given case that is dispositive." *Id.* (quoting *Entrepreneur Media*, 279 F.3d at 1140 (internal quotation marks omitted)).

   a. <u>Strength of Mark</u>

   The Court first addresses the strength of Talking Rain's SPARKLING ICE mark.  The scope of a mark's trademark protection depends on its strength, "with stronger marks receiving greater protection than weak ones."  *Entrepreneur Media*, 279 F.3d at 1141; *see also Brookfield*, 174 F.3d at 1058.  To determine the strength of the SPARKLING ICE mark, the Court must place it on the conceptual distinctiveness spectrum.  *See Brookfield*, 174 F.3d at 1058.  On this spectrum, the most distinctive marks – *i.e.*, arbitrary and fanciful marks – receive the most trademark protection, whereas the least distinctive marks – *i.e.*, generic marks – receive no trademark protection.  *Entrepreneur Media*, 279 F.3d at 1141.  Suggestive and descriptive marks lie between these two extremes, with suggestive marks being entitled to greater protection than descriptive marks.  *Id.*  Unlike descriptive marks, which "define qualities or characteristics of a product in a straightforward way," suggestive marks convey impressions of goods that require the consumer to "use imagination or any type of multistage reasoning to understand the mark's significance." *Id.* at 1141-42 (internal quotation marks omitted).  The Court also looks to the commercial strength of the marks.  *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).

   In this case, Plaintiff asserts that its marks are strong, and are therefore entitled to protection. Plaintiff first argues that the marks SPARKLING ICE and ICE are at least suggestive as applied to flavored carbonated water and may very well qualify as arbitrary:

ORDER
PAGE - 8

> In ordinary usage, the noun "ice" means "frozen water."  The terms "sparkling ice" and "ice" have no dictionary definition or commonly understood meaning pertaining to carbonated water (whether flavored or unflavored) in liquid form.  Use of those terms in relation to carbonated water is meaningful to English speakers, if at all, only as a very oblique allusion to the notion that such water provides one who drinks it with the same feeling of refreshment and coolness as a piece of ice.  (But even that interpretation is attenuated, since one does not "drink" ice.)  Application of those terms to Talking Rain's product requires, at a minimum, that customers "use some additional imagination and perception to decipher the nature of [the] goods."

Dkt. #4 at 13.

Defendant essentially argues that the use of the word "Ice" in the sparkling beverage market is so widespread, that it is essentially a generic term not subject to any protection:

> The use of "ICE" is so widespread that, in the current marketplace, "ICE" is not a source identifier; it is a category of beverage products.  Due to widespread use by competing beverages, the term "ICE" is not protectable as a trademark, and has likely become a generic means of directing the consumer that the beverage is a zero calorie, fruit flavored, sparkling water product that should be served cold or chilled.

Dkt. #25 at 10.

The Court disagrees with Defendant for several reasons.  First, as a matter of law, the fact that Plaintiff's trademarks are "incontestable" creates a presumption that they are not merely descriptive or generic.  The Lanham Act provides that a registered trademark may become incontestable when certain requirements are met, one of which is filing with the USPTO an affidavit "setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for . . . five consecutive years [after the registration date] and is still in use in commerce."  15 U.S.C. § 1065(3).  An incontestable trademark registration is "conclusive evidence of the validity of the registered mark and of . . . the registrant's exclusive right to use the registered mark in commerce . . . on or in connection with the goods or services specified in the affidavit".  *Id.* at § 1115(b)(2).  The

Ninth Circuit Court of Appeals has noted that "the federal officials who register a mark are perceived to have some expertise in assessing if it is entitled to registration, and absent a presentation of secondary meaning, their registration is entitled to a presumptive validity, a presumptive conclusion that the mark was distinctive else they would not have registered it." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010).   Thus, Talking Rain is entitled to a presumption that "Sparkling Ice" and "Ice" are not merely generic.

Likewise, the Court rejects Defendant's argument that the marks have been weakened by third-party use.  DS Services notes that at least seven other beverages in the category use the term "Ice" in its name, and are sold in similar bottle shapes with fruit on the labels.  Dkt. #26 at ¶ 23.  It is true that extensive use of similar marks by third-parties can reduce the commercial strength of a mark.  *Brookfield*, 174 F.3d at 1143; *see also M2 Software*, 421 F.3d at 1088; *Entrepreneur Media*, 279 F.3d at 1143-44 ("[T]hat the marketplace is replete with products using a particular trademarked word indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will *not* be confused by its use."); *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) (noting that in a crowded field "customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other").  However, in this case, Defendant's evidence is deficient.  Defendant does not provide any discussion or evidence of how long those other products have used ICE; what the geographic extent of their distribution is; or how much their producers spend to promote the brands.  "[T]he defendant must show that these [third party] uses tend to negate the plaintiff's claim to a strong mark."  *Miss Universe, Inc. v. Little Miss U.S.A., Inc.*, No. C80-1364A, 1981 WL 40568, at *4 (N.D. Ga. June 19, 1981).  Moreover, Defendant's own witness Rhonda Harper presents a pie chart depicting the market

share of competitors in this field, which demonstrates the flaws in Defendant's brand comparison. *See* Dkt. #27 at ¶ 28. A few of the ICE brands identified by DS Services do not appear on the chart at all. *Id.* The chart shows that SPARKLING ICE accounts for 68% of sales in the market – or 82% if including SPARKLING ICE LEMONADE. *Id.* Competitive products using ICE in their names have minimal market share: CASCADE ICE, 4%; KLARBRUNN VITA ICE, 1%; CLEAR CHOICE ICE, 0%; SPRINGTIME ICE, 0%. *Id.* Thus, Defendant itself provides evidence of only *de minimis* market penetration of the other ICE brands. Therefore, there is no reason to presume that those brands have weakened strength of Talking Rain's ICE mark.

Finally, Ms. Harper concedes that the SPARKLING ICE brand is "dominate" and has "strong consumer awareness." Dkt. #27 at ¶ 28. Considering that opinion, along with the national scope of Sparkling Ice's sales and Talking Rain's marketing efforts, the Court finds that Talking Rain enjoys sufficient marketplace recognition to render its SPARKLING ICE and ICE marks commercially strong, and this factor weighs in favor of Talking Rain. *Pom Wonderful*, 775 F.3d at 1126.

              b.   <u>Relatedness of Goods</u>

The Court next turns to the relatedness of the goods at issue. "Related goods (or services) are those 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012) (quoting *Sleekcraft*, 599 F.2d at 348 n.10). To satisfy the relatedness factor, parties need not be direct competitors, *id.*; *see also Entrepreneur Media*, 279 F.3d at 1147 (explaining that goods are related when both companies offer products relating to

ORDER
PAGE - 11

the same general industry), so long as the goods "are similar in use and function," *Sleekcraft*, 599 F.2d at 350.

In the instant case, there can be no genuine argument that SPARKLING ICE and SPARKLETTS ICE are nearly identical products. They are both single-serve, non-alcoholic, sparkling, fruit-flavored, carbonated water beverages. They compete directly against each other. Thus, this factor weighs in favor of Talking Rain. *See Pom Wonderful*, 775 F.3d at 1127.

### c.   Degree of Consumer Care

With respect to consumer care, the Court should find that this factor also weighs in favor of Talking Rain. "It is assumed that buyers will exercise greater care in the purchases of expensive goods." *Official Airline Guides v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993). Conversely, purchasers of inexpensive goods "are likely to exercise less care, thus making confusion more likely." *Brookfield*, 174 F.3d at 1060. In this case, the beverages at issue cost between 88 cents and $1.29. Thus, consumers are likely to exercise a low degree of care when purchasing either company's beverages. While it is true that price alone is not always the deciding factor, Defendant presents the Court with no evidence contradicting the general premise that a lower price point implies lower consumer care. As a result, this factor weighs in favor of Talking Rain. *See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1070-71 (9th Cir. 2015); *Pom Wonderful*, 775 F.3d at 1127.

### d.   Similarity of Marks

Turning now to the similarity of the marks at issue, this factor is always important in determining whether a likelihood of confusion exists because when "marks are entirely dissimilar, there is no likelihood of confusion." *Pom Wonderful*, 775 F.3d at 1127 (citation

ORDER
PAGE - 12

omitted).   Accordingly, as the similarities between two marks increase, so too does the

likelihood of confusion.  *Id.* (citing *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206

(9th Cir. 2000)).  As the Ninth Circuit Court of Appeals has explained:

> The following axioms define and delimit the similarity analysis: (1)
> similarity is best evaluated by appearance, sound, and meaning; (2) marks
> should be considered in their entirety and as they appear in the marketplace;
> and (3) similarities weigh more heavily than differences.

*Pom Wonderful*, 775 F.3d at 1127-28 (citation omitted).

The outcome of this factor in the instant case is practically dictated by the Ninth

Circuit's decision in *Pom Wonderful*.  In that case, the Court found the marks "POM" and

"pŏm" to be similar, explaining:

> Most significantly, each mark is comprised of the same three letters.  These
> three letters are presented in the same order, with a stylized second letter
> (i.e., the "o" in "POM" is heart-shaped, and the "o" in "pŏm" has a breve
> over it).  In addition, the letters in both marks are uniformly cased (i.e., they
> are either all uppercase, or all lowercase) and presented in a simplistic,
> white front that is offset by a dark maroon background.

> Admittedly, the marks also possess some visual dissimilarities, particularly
> when we consider the marks in the context of their respective labels, with
> the Pom Wonderful bottle on the left, the front of the Pur can in the center,
> and the back of the Pur can on the right.
> . . .

> As these images reveal, the presentation of the marks differs in terms of
> prominence, font, size, and capitalization (i.e., "POM" is prominently
> displayed at the top of the bottle in thicker font and larger uppercase letters,
> whereas "pŏm" is placed near the bottom of the front of the can in slimmer
> font and smaller lowercase letters).  In addition, the middle letter in each
> mark is stylized differently (i.e., the "o" in "POM" is shaped like a heart
> and is filled-in with red color, whereas the "o" in "pŏm" has a breve over it
> and is not filled-in with color).

> However, because "[l]ooks aren't everything," we next compare the marks'
> sound and meaning.  *Brookfield*, 174 F.3d at 1055.  As for the sound of the
> marks, the district court found that "POM" and "pŏm" are pronounced in
> precisely the same manner.  Because neither party contests this finding on
> appeal, we agree that the marks are aurally identical.

ORDER
PAGE - 13

As for the meaning of the marks, the district court found that "POM" and "pŏm" mean precisely the same thing, as "each refers to pomegranate flavoring and/or ingredients." Order 33.  Because neither party contests this finding on appeal, we agree that the marks are semantically identical.  This similarity is particularly noteworthy because "[c]loseness in meaning can itself substantiate a claim of similarity of trademarks." *Sleekcraft*, 599 F.2d at 352.

Balancing the marks' many visual similarities, perfect aural similarity, and perfect semantic similarity more heavily than the marks' visual dissimilarities – as we must – the similarity factor weighs heavily in Pom Wonderful's favor.  And, because a lesser degree of similarity is required when a trademark holder's mark is strong, the commercial strength of the "POM" mark amplifies the significance of the marks' many similarities. *See Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) ("[T]he fact that the similarity involves the use of a much stronger mark would make that similarity weigh more heavily in the analysis of this factor." (Internal quotation marks omitted)).  Mistakenly weighing the marks' differences more heavily than their similarities, the district court clearly erred in finding that the similarity of marks factor weighed against Pom Wonderful.

*Pom Wonderful*, 775 F.3d at 1128-30.

In the instant case, when looking at the products visually, there are many similarities. Both beverages are contained in 17-ounce, single serve bottles that are virtually identical in shape, with a white screw top.  The marks SPARKLING ICE and SPARKLETTS ICE are both printed on a transparent wrap-around plastic labeling that runs nearly the length of the bottle and allows the color of the fluid inside to show through.  The brand name of the product is printed on the label in white letters with a picture of a piece of fruit corresponding to the flavor shown above the brand name against a white background.  Both brand names start with the same five letters and end with the word "Ice."  Side by side, the bottles appear as shown:

ORDER
PAGE - 14

As in *Pom Wonderful*, the Court notes the visual dissimilarities as well. "Sparkling Ice" is printed horizontally, with the word "Ice" in a bigger font size, while "Sparkletts Ice" is printed vertically in different fonts of the same approximate size. On the "Sparkling Ice" label, the fruit image is encased in ice, while the fruit image on the "Sparkletts Ice" label is merely contained in a circle with a white background. However, because "[l]ooks aren't everything," the Court next compares the marks' sound and meaning. *Brookfield*, 174 F.3d at 1055.

Talking Rain notes, as does the Court, that the two brand names are similar in sound. Both consist of three syllables, with the same stress pattern (stressed, unstressed, stressed). The stressed syllables are identical – "SPARK" at the beginning and "ICE" at the end. In both, the second syllable begins with the "L" phoneme. Likewise, Defendant admits that both names refer to non-alcoholic, fruit-flavored, carbonated water beverages that should be served cold. While the Court should not find that the mark itself has such a generic meaning, Defendant's assertion should be noted as an admission that the names are similar in meaning.

Considering the marks' many similarities and weighing them more heavily than the dissimilarities, the Court finds that the similarity factor weighs in favor of Talking Rain. *See Pom Wonderful*, 775 F.3d at 1128-30.

ORDER
PAGE - 15

e.  <u>Marketing Channel Convergence</u>

The Court next turns to the marketing channel convergence factor.  Just as visual, aural, and semantic similarities between marks increase the likelihood of confusion, so too do convergent marketing channels.  *Sleekcraft*, 599 F.2d at 353.  In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products.  *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987).  Marketing channels can converge even when different submarkets are involved so long as "the general class of . . . purchasers exposed to the products overlap."  *See Sleekcraft*, 599 F.2d at 353 (finding convergence where both companies sold boats to authorized retail dealers in diverse localities, used the same sales methods, advertised extensively through different national magazines, and priced their products almost identically).

In this case, it is likely that Talking Rain will be able to show that both companies use parallel market channels.  First, both companies sell their products in supermarkets located throughout the United States.  The evidence presented by Talking Rain demonstrates at least some overlap in supermarkets.  Dkt. #5 at ¶ ¶ 16-18 and Exs. 15-16.  In addition, both Talking Rain and DS Services utilize the internet for sales, and engage in home and business delivery.  Both promote their products by means of print ads, websites, and social media sites.  Dkt. #5 at ¶ ¶ 7 and 23 and Ex. 17.  "[T]he simultaneous use of the Web as a marketing channel" increases the likelihood of consumer confusion.  *See Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 (9th Cir. 2002).  The fact that DS Services asserts that its primary sales are direct to the end-user rather than retail outlets is of no import.  A channel of trade is not limited to identical stores or agents.  *See Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992) (explaining that "a channel of trade includes the same type

ORDER
PAGE - 16

of distribution channel" and that channels converge "when products [are] sold under opposing marks in supermarkets and grocery stores across the country").

Second, just as the Ninth Circuit Court of Appeals found in *Pom Wonderful*, the products at issue are highly similar.  Both companies sell inexpensive, non-alcoholic, fruit-flavored, carbonated water beverages.  *See Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1244 (9th Cir. 1984) (finding market channel convergence where the goods at issue – pens – were "essentially interchangeable," "inexpensive," and "disposable").  This suggests an overlapping general class of consumers.  Accordingly, this factor weighs in favor of Talking Rain.  *See Pom Wonderful*, 775 F.3d at 1130-31.

f.   Actual Confusion

The Court now turns to evidence of actual confusion, noting that failing "to prove instances of actual confusion is not dispositive against a trademark plaintiff" because "difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."  *Perfumebay.com*, 506 F.3d at 1176 (internal quotation mark and emphasis omitted); *see also Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072-73 (9th Cir. 2014) (explaining that actual confusion is "of diminished importance" at the preliminary injunction stage because "a motion for preliminary injunction normally occurs early in litigation," before the parties "have amassed significant evidence of actual confusion").

Interestingly, in this case, Plaintiff has submitted some evidence of what appears to be actual consumer confusion.  On June 9, 2015, Camille D. Linkous of the Dilkon Judicial District in Dilkon, Arizona sent an email to Talking Rain via the email function of its SPARKLING ICE website:

> Hello, this is Camille from the Dilkon Judicial District, Dilkon, Arizona (Acct #11115934 060115).  The staff here would like to know if the new

ORDER
PAGE - 17

> Sparkle sparkling water and Sparkletts ice is available in a variety pack? ... if there are samples that the delivery person could provide to us?  Our anticipated next delivery is expected on June 19th, 2015.  Thank you.

Dkt. #7, Ex. 1.

On June 18, 2015, Ms. Linkous sent a second email:

> Hello. I sent you an email on or about June 9th, and haven't heard back from you since.  Please advise.  I, or we, here at the Dilkon Judicial District Court are very interest [*sic*] in your Sparkling ICE water.

*Id.*

It appears that the Dilkon Judicial District is a delivery customer of DS Services, but Ms. Linkous mistakenly believed that Talking Rain is the source of the new SPARKLETTS ICE product and that she could communicate with the maker of that product through the SPARKLING ICE website.  While DS Services argues that this email contact is *de minimis* and therefore does not establish likelihood of consumer confusion, the Court disagrees.  As noted above, at this stage of the proceedings it is often difficult to obtain any proof of actually confusion.  Accordingly, even *de minimis* evidence tends to weigh in favor of Talking Rain.

In addition, Plaintiff has provided results from a consumer survey demonstrating a "net" confusion level of 33%.  Dkt. #6, Ex. 1.  Defendant argues that the survey is flawed and biased and should be rejected.  Dkt. #25 at 19-21.  It presents its own survey expert who purports to reveals those flaws and biases.  Dkt. #27.  In addition, the Court has considered Defendants' own survey results, which apparently demonstrate less than 10% actual consumer confusion.  *See* Dkt. #38.  However, the Court finds that Defendants' argument go primarily to the weight to be given to Plaintiff's evidence, and do not serve as a basis to strike the evidence in its entirety.  Moreover, even if the Court was to disregard the survey data, it would not be fatal to

ORDER
PAGE - 18

Talking Rain.  *Perfumebay.com*, 506 F.3d at 1176, *supra*.  As a result, the Court finds that this factor weighs slightly in favor of Talking Rain, or is, at worst, neutral.

### g.   Defendant's Intent and Product Expansion

As the Ninth Circuit has noted, evidence of a defendant's intent to confuse customers or of product expansion is not required for a finding of likelihood of confusion.  *Pom Wonderful*, 775 F.3d at 1132 (citing *GoTo.com*, 202 F.3d at 1208 (characterizing the intent factor as minimally important and explaining that intent to confuse consumers is not necessary to demonstrate a likelihood of confusion) and *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 509 (9th Cir. 2011) (characterizing the product expansion factor as "neutral" because neither party presented evidence regarding the likelihood of expansion)).  Although Talking Rain has argued circumstantial evidence of an intent to confuse, at this stage of the proceedings the Court is not convinced of any intent by DS Services to deceive consumers.  Thus, the Court finds that this factor does not weigh in favor of Talking Rain.

With respect to product expansion, Talking Rain argues that the factor is irrelevant, and Defendant does not dispute that assertion.  Accordingly, this factor is neutral.

### h.   Totality of the Facts

Based on the above analysis, the Court has determined that six of the *Sleekcraft* factors weigh in favor of Talking Rain (strength of mark, relatedness of goods, degree of consumer care, similarity of marks, marketing channel convergence, and actual confusion) one factor is neutral (product expansion), and one factor weighs in favor of DS Services (intent to deceive). The Court recognizes that sheer numerosity of *Sleekcraft* factors is not by itself dispositive of the ultimate likelihood-of-confusion determination.  *Pom Wonderful*, 775 F.3d at 1132 (citing *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1395 (9th Cir. 1993)).  However, when

looking at these factors in light of the totality of the facts in this case at present time, the Court finds that Talking Rain has demonstrated that consumers are likely to be confused as to the source of DS Services' SPARKLETTS ICE beverage.

Thus, having shown: (1) that it has a protected ownership interest in the marks; and (2) that DS Services' use of the mark SPARKLETTS ICE is likely to cause consumer confusion, Talking Rain has demonstrated a strong likelihood of success on the merits in this case.

### 3. *Irreparable Harm*

The Court must now evaluate Plaintiff's assertion that it will suffer irreparable harm if a preliminary injunction does not issue. This question is a difficult one. Plaintiff argues that it will suffer two forms of likely irreparable harm: (1) a loss of sales that cannot be practicably quantified and recovered as damages; and (2) a loss of Talking Rain's control over its reputation for offering a wide variety of flavors. Dkt. #31 at 10. Defendant argues that Plaintiff has provided nothing but conclusory arguments and bare speculation in support of assertions, and therefore fails to demonstrate irreparable harm. Dkt. #25 at 5-8. The Court agrees with Defendant.

In *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239 (9th Cir. 2013), the Ninth Circuit Court of Appeals adopted the standard that a plaintiff must establish irreparable harm for a preliminary injunction in a trademark infringement case, rather than presume irreparable harm when there has been a determination of likelihood of success on the merits. *Herb Reed*, 736 F.3d at 1249. Further, the harm must be imminent. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Los Angeles Memorial Coliseum v. National Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980); *see also Amylin Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 456 Fed. Appx. 676, 679 (9th Cir. Oct. 31, 2011)

("[E]stablishing a threat of irreparable harm in the indefinite future is not enough").  Thus, a party seeking injunctive relief must adduce evidence of likely irreparable harm and may not rely on "unsupported and conclusory statements regarding harm [the plaintiff] might suffer" in the future.  *Herb Reed Enterprises*, 736 F.3d at 1250.

Here, Plaintiff first argues that any lost profits will be difficult to quantify or calculate:

> For a low-priced product sold at retail, it is essentially impossible for a plaintiff to point to specific sales lost due to consumer confusion; lost sales can be shown, if at all, only through statistical analysis of a large number of transactions.  But that is difficult in this case.  This is not a situation where the plaintiff's product has a stable sales pattern such that any decrease in sales at or after the commencement of infringement can confidently be said to reflect damages from the defendant's conduct. Sales of SPARKLING ICE have grown rapidly in recent years and will continue to grow with or without SPARKLETTS ICE on the market.  In light of that upward sales trajectory, it would be very difficult to reliably identify or calculate Talking Rain's lost sales from the infringement. . . .

Dkt. #4 at 22.   Plaintiff provides no support for this argument from anyone other than a statement by its CEO Kevin Klock.  Dkt. #5 at ¶ 26.  Mr. Klock does not point to any testimony by an economist or other evidence that lost profits would be difficult to calculate.  Accordingly, the Court does not find the lost profit argument persuasive.

Plaintiff also argues loss of control over its reputation which cannot be quantified.  Both the Federal Circuit and Ninth Circuit Court of Appeals have held that loss of goodwill and injury to reputation often constitute irreparable harm.  *See, e.g., Herb Reed, 736 F.3d at 1250; Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) (holding that evidence of loss of customer goodwill supports finding of irreparable harm); *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (finding that loss of revenue and goodwill constitute irreparable harm).  Loss of goodwill and reputation qualify as irreparable harm because monetary damages are inadequate to compensate a plaintiff

ORDER
PAGE - 21

injured in this manner.   However, irreparable harm will not be presumed where plaintiff presents no proof beyond speculation that his reputation or goodwill in the market will be damaged, because the Court has no way of evaluating this intangible harm.   *Mirina Corp. v. Marina Biotech*, 770 F. Supp. 2d 1153, 1162 (W.D. Wash. 2011).   In this case, Plaintiff only speculates.   *See* Dkt. #5 at ¶ 27.   Mr. Klock essentially states that consumers may see SPARKLETTS ICE in only three flavors and may believe that Talking Rain has reduced its flavor choices, thereby creating some damage to its reputation.   *See* Dkt. #5 at ¶ 27.   This is speculative at best.   Talking Rain has adduced no evidence that its consumers know about SPARKLETTS ICE and the limited flavors it comes in, or that it has caused any negative reaction to its own SPARKLING ICE.

During the hearing on this motion, Talking Rain argued that there is a distinction between likelihood of irreparable harm and a showing of actual harm.   This Court agrees.   As noted above, what Talking Rain must show is a likelihood of irreparable harm if an injunction is not entered.   It need not show actual harm or actual confusion.   The Court further agrees that one way to show a likelihood of future irreparable harm is to show that there has, to date, been some actual confusion or harm.   A review of the case law in the Ninth Circuit since *Herb Reed Enterprises* indicates that in many instances, some evidence of actual confusion or actual harm to the plaintiff's brand tipped the scales in favor of a finding of likely irreparable harm in the absence of an injunction.   For example, in *OTR Wheel Engineering, Inc. v. West Worldwide Services, Inc.*, 602 Fed. Appx. 669, 672 (9th Cir. Mar. 18, 2015), the Ninth Circuit Court of Appeals noted:

> The district court did not clearly err in finding that OTR was likely to suffer irreparable harm absent a preliminary injunction.   Loss of control over business reputation and damage to goodwill are cognizable irreparable harms in the trademark infringement context. Although the

ORDER
PAGE - 22

district court's finding of reputational injury was not based on any evidence that West's lookalike tire was an inferior product, the court's finding of goodwill injury was supported by some record evidence. West was selling its allegedly infringing tire to OTR's major customer, Genie Industries, leading OTR to admonish its customer and eventually to question Genie whether it had leaked OTR's confidential information to West. From this, it was reasonable to conclude that OTR would likely suffer a nonquantifiable injury to the goodwill it had created with its customer, and that an injunction preventing West from selling the allegedly infringing tires to Genie and other OTR customers would forestall further deterioration in its business relationships.

*OTR Wheel Engineering, Inc.*, 602 Fed. Appx. At 672 (citations omitted)).

Similarly, in *Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 Fed. Appx. 469 (9th Cir. Feb. 4, 2015), the Ninth Circuit Court of Appeals explained:

The Supreme Court has made clear that courts cannot presume that irreparable harm follows from a likelihood of success on the merits of an infringement claim. Accordingly, the district judge based his finding of irreparable harm on evidence in the record. A Life Alert employee submitted a declaration reporting numerous and persistent complaints from would-be customers who received robo-calls for what they believed were Life Alert products. Life Alert also submitted emails and social media posts from consumers. This material substantiates the threat to Life Alert's reputation and goodwill. This type of harm constitutes irreparable harm, as it is not readily compensable.

*Life Alert Emergency Response, Inc.*, 601 Fed. Appx. At 473-74 (citations omitted)).

However, in the instant case, while the Court has noted some evidence of consumer confusion, that evidence does not go toward the consumer's perception of the reputation of the company. There simply is no tangible evidence to support Talking Rain's assertion that it will suffer irreparable harm if an injunction does not issue. As a result, a preliminary injunction will be denied.

///

///

ORDER
PAGE - 23

## IV.   CONCLUSION

Having reviewed Plaintiff's Motion for Preliminary Injunction, the opposition thereto, and the Reply in support thereof, along with the exhibits and Declarations, the parties' oral arguments, Defendant's supplemental evidence and the remainder of the record, the Court hereby finds and ORDERS that Plaintiff's Motion for Preliminary Injunction (Dkt. #4) is DENIED.

DATED this 12th day of February 2016.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 24